## A10A2052. ARELLANO-CAMPOS v. THE STATE.
### (705 SE2d 323)

MIKELL, Judge.

Appellant Salvador Arellano-Campos was convicted of two counts of rape, based in part on evidence that he had sexually abused his girlfriend's daughter, I. M. C., since she was eleven years old. The rapes for which appellant was convicted occurred in May 2004, when I. M. C. was 17 years old. Appellant was sentenced to life in prison. On appeal from the order denying his motion for a new trial, appellant challenges the sufficiency of the evidence to support his conviction and the effectiveness of his trial counsel. We affirm.

1. Citing contradictions and inconsistencies in the evidence, appellant contends that the state failed to prove that he raped I. M. C. We disagree.

---

On appeal from a criminal conviction, we view the evidence in the light most favorable to the jury's verdict, and appellant no longer enjoys a presumption of innocence.[1] We do not weigh the evidence or determine witness credibility.[2] Rather, we determine, based on the evidence adduced at trial, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3] Moreover, conflicts in the testimony of the witnesses, including the state's witnesses, are for the jury to resolve.[4] "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the [s]tate's case, we must uphold the jury's verdict."[5]

Rape is committed when a person has carnal knowledge of a female forcibly and against her will.[6]

> [T]he terms "forcibly" and "against her will" are two separate elements of proving rape. The term "against her will" means without consent; the term "forcibly" means acts of physical force, threats of death or physical bodily harm, or mental coercion, such as intimidation. . . . Further, force may be proved by direct or circumstantial evidence.[7]

Contrary to appellant's assertions, the evidence in the case at bar was sufficient for any rational trier of fact to find him guilty of rape. I. M. C., who was twenty years old at the time of trial, testified that she had known appellant since she was four years old, when he began dating her mother and moved in with them in Mexico. I. M. C. called him "dad" and considered him as her father. I. M. C. testified that he began sexually abusing her when she turned 11. She stated that one day, appellant told her that he loved her and ordered her to take her clothes off. Appellant threatened to harm her family if she refused. Repulsed, I. M. C. said no, but appellant removed her clothing and put his penis inside her vagina. I. M. C. testified that it hurt, and she bled. She testified that appellant told her not to tell anyone or else her family would "pay very badly." Appellant raped I. M. C. repeatedly and abused her in other ways as well. He would scream at her, "asshole, useless, idiot good for nothing," and once

---

[1] *Chaparro v. State*, 279 Ga. App. 145 (630 SE2d 645) (2006).

[2] Id.

[3] Id.

[4] *Mora v. State*, 295 Ga. App. 641, 642 (1) (673 SE2d 23) (2009).

[5] (Citation omitted.) *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

[6] OCGA § 16-6-1 (a) (1).

[7] (Citations and punctuation omitted.) *Pollard v. State*, 260 Ga. App. 540, 542-543 (3) (580 SE2d 337) (2003).

beat her with a shovel. Appellant beat I. M. C.'s nine-year-old brother repeatedly, even punching him in the face. I. M. C. testified that the police were called but did nothing because appellant bribed them.

Appellant and I. M. C.'s mother separated when I. M. C. was 13 years old. Still she did not report his abuse, fearing repercussions. Appellant returned when I. M. C. was 14 and began raping her again. She believed that he would kill her family if she told anyone. He took her to a hotel on her 15th birthday, in 2001, claiming he had a surprise for her, and then raped her again. Appellant made a videotape of the incident; he claimed that the videotape was in his mother's possession.

I. M. C. testified that the day after her birthday, appellant brought her from Mexico to the United States, promising her that she would attend school and that her mother would join them. The promises were false. Instead of permitting I. M. C. to attend school here, appellant put her to work selling cheese door-to-door. At the time of trial, she had only a sixth grade education. Appellant allowed her to speak to her family in Mexico but supervised the conversations and instructed her to say that she was studying. After living in one apartment for a year or so, I. M. C. testified that her mother learned their address and expressed an intention to visit. Appellant told I. M. C.'s mother that they were already back in Mexico, which was false. Then appellant moved I. M. C. to a different apartment and never allowed her to call her mother again. According to I. M. C., appellant installed a lock on the front door that could only be opened from the outside, and he kept I. M. C. locked in. He made her cook and do laundry and screamed at her, "idiot, . . . stupid imbecile." I. M. C. testified that appellant continued to force her to have sexual intercourse and to threaten to harm her family if she refused.

Finally, on May 17, 2004, I. M. C. saw a taxi driving by and flagged down the driver, who took her to the Norcross police station. She testified that she escaped from the apartment through the window. I. M. C. told the police that appellant generally raped her "every third day," but had raped her on each of the two days before she came to the police station. She testified that she had been watching cartoons when appellant told her to turn off the television and unbutton her pants. She tried to refuse him but he threatened her family.

At the police station, officer David Aguilar interviewed I. M. C., who stated that appellant, whom she referred to as her mother's boyfriend, had touched her and penetrated her. Aguilar testified that I. M. C. was crying and embarrassed during the interview. After I. M. C. gave a statement to Aguilar, she was taken to the Gwinnett County Sexual Assault Center, where she was examined by Katherine

Boyd "Kabee" Johnston, an expert sexual assault nurse examiner. Sergeant Edward Restrepo of the Gwinnett County Police Department assisted in translating for I. M. C., as she spoke only Spanish.

Johnston testified that I. M. C. told her, through Restrepo, that her "stepfather" had been vaginally penetrating her since she was 11 years old and that the last sexual assault had occurred 18 hours earlier. The parties stipulated that samples collected from the vaginal examination performed by Johnston failed to reveal the presence of seminal fluid. Johnston testified, however, that due to the physical characteristics of the vagina and the fact that she used dry swabs to collect the samples, there could have been seminal fluid in I. M. C.'s body that the swabs did not pick up. Johnston also testified that her examination revealed that I. M. C. "had little pieces of hymen left," which would be consistent with a person having intercourse for a "fairly long period of time." I. M. C. was 17 years old at the time of the examination. Finally, Johnston testified that I. M. C.'s statement that she had been vaginally penetrated since she was 11 years old, most recently 18 hours earlier, was consistent with the physical examination.

The parties stipulated that Restrepo advised appellant of his constitutional rights in Spanish and that he freely, willingly and voluntarily waived those rights before making a statement to the police. Restrepo testified that appellant, who was in his 40s, initially stated that he lived with I. M. C. in a "father-daughter type relationship" and that he had dated I. M. C.'s mother in Mexico. Appellant repeatedly denied having any sexual contact with I. M. C. until detectives confronted him with the possibility that semen evidence may have been collected from her. Appellant then admitted that he had sexual intercourse with I. M. C. two or three times. Appellant claimed that I. M. C. initiated the sex by grabbing his penis and that he told her, "No, we can't do this; I'm your father." Over his objection, a portion of appellant's videotaped statement was played for the jury. When questioned about the rapes for which he was indicted, appellant stated: "Well, what happened was I didn't feel like doing it but she provoked me."

Appellant presented the testimony of two witnesses and testified in his own behalf. I. M. C. had obtained a business card from the taxi driver who took her to the police station, and he had written his name and cell phone number on the card. The taxi driver identified the card but did not recognize I. M. C. and testified that he had never helped anyone climb out of a window.

Jose Espinosa Guzman, appellant's brother-in-law, testified that appellant lived with him for a year in 2001 but then left with his "mate." Guzman testified that he did not know the name of appellant's "mate" although he had known her since she was a little

girl. According to Guzman, appellant introduced the victim as his "girlfriend," and they seemed to have a "good, normal," and "intimate" relationship.

Finally, appellant testified. He admitted that he had sexual relations with I. M. C. "more than once" and claimed that they lived "like a couple" for more than 16 months. According to appellant, they first had sexual relations when I. M. C. was 16 years old. Appellant claimed that their relationship was consensual and that they "got along marvelously." Appellant denied ever threatening to harm I. M. C.'s family if she refused to have sex with him. Appellant testified that he lied to the police when he told them that his relationship with I. M. C. was that of father and daughter. He also testified that he lied to the police when he stated that he had a romantic relationship with I. M. C.'s mother. Appellant claimed that the police forced him to say that he had been having sex with I. M. C. since she was 11 years old by verbally mistreating him and threatening to kill him. Restrepo testified in rebuttal that he did not threaten or verbally abuse appellant when interviewing him.

Appellant contends that the evidence adduced at trial is insufficient to sustain his conviction because the victim's testimony concerning the method of her escape from the apartment was contradicted by the taxi driver and her testimony concerning bars on the apartment window was not supported by other witnesses. But these issues were fully explored before the jury, and it was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.[8]

Appellant further contends that there was no evidence of force. We disagree. "Lack of resistance, induced by fear, is force, and may be shown by the prosecutrix' state of mind from her prior experience with appellant and subjective apprehension of danger from him."[9] Here, I. M. C. testified that appellant threatened to harm her family if she did not have sex with him. I. M. C. believed him, as he beat her with a shovel, beat her little brother repeatedly, and induced her with false promises to travel from Mexico to the United States, where he kept her a virtual prisoner in his apartment. The jury was authorized to find from I. M. C.'s testimony that any lack of resistance on her part was induced by fear of reprisal and that appellant had carnal knowledge of her forcibly and against her will. Accordingly, we conclude that the evidence adduced at trial was sufficient to enable

---

[8] *Mickens v. State*, 277 Ga. 627, 629 (593 SE2d 350) (2004).

[9] (Citation and punctuation omitted.) *Pollard*, supra at 543 (3); accord *Bradberry v. State*, 297 Ga. App. 679, 681 (1) (678 SE2d 131) (2009); *Wightman v. State*, 289 Ga. App. 225, 228 (1) (656 SE2d 563) (2008).

any rational trier of fact to find appellant guilty beyond a reasonable doubt of two counts of rape.[10]

2. Appellant next complains that the trial court erred in denying his motion for new trial on the ground of ineffective assistance of counsel. He argues that trial counsel rendered ineffective assistance by stipulating to the admissibility of his custodial statement and by failing to present purportedly exculpatory evidence available at the time of trial.

In order to prevail on his ineffective assistance claim, appellant must show that trial counsel performed deficiently and that the deficient performance prejudiced him.[11] To prove that his trial counsel performed deficiently, appellant "must overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct."[12] In order to establish prejudice, appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[13] On appellate review, "we accept the trial court's factual findings and credibility determinations unless [they are] clearly erroneous, [while] we independently apply the legal principles to the facts."[14]

(a) *The statement.* Appellant contends that trial counsel performed deficiently in failing to file a motion to suppress his custodial statement, and in stipulating to its admissibility, because it was obtained in violation of *Miranda.*[15] "When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion."[16] We conclude that appellant did not make the requisite showing.

> When a defendant invokes his right to counsel, police must cease all further interrogation until counsel is made available to defendant. However, if after invoking his right to counsel a defendant initiates further communication with

---

[10] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[11] *Coleman v. State*, 286 Ga. 291, 297 (6) (687 SE2d 427) (2009).

[12] (Citation and punctuation omitted.) *Adams v. State*, 283 Ga. 298, 299 (3) (658 SE2d 627) (2008).

[13] (Citation and punctuation omitted.) *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009).

[14] (Footnote omitted.) *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

[15] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[16] (Citation and punctuation omitted.) *Gassett v. State*, 289 Ga. App. 792, 797 (6) (b) (658 SE2d 366) (2008).

police and knowingly and intelligently waives his right to counsel, police can question defendant further.[17]

The record herein shows that these conditions were satisfied. The transcript of appellant's videotaped interview, which was introduced into evidence at the new trial hearing, reveals that after being advised of his *Miranda* rights, appellant stated, "I need an attorney to defend me." The police officer who was questioning him, Restrepo, then stated, "Ok. So you want an attorney?" Appellant replied "yes." The following colloquy ensued:

[Restrepo:] Ok. You don't want to talk to me?
[Appellant:] I don't know what I'm being accused of. I was not told anything.
[Restrepo:] Before I can speak with you, you have to understand your rights. And then I explain to you everything that is happening and then you can understand at that time if you want to talk to me or not.
[Appellant:] I need to know what this is about. . . .
[Restrepo:] Ok, I'll repeat it to you again. If you want to talk to me, we'll talk. . . . And for me to be able to explain to you everything that is happening, and you to talk to me, you have to say yes, yes you understand your rights or you don't understand them or you don't want to talk to me.
[Appellant:] Ok, yes, I understand them. . . . And I need an attorney. I need to make a call.
[Restrepo:] Ok. That's fine. One moment, ok?

The transcript shows that, at that point, Restrepo stopped the interview and left the room. The time stamp on the tape indicates that the recording was restarted seven minutes later. Restrepo testified that he stopped the tape because appellant had asked for a lawyer. He further testified that while preparing appellant for transport to the jail, appellant asked him "what this was all about." Restrepo answered that "it was about him and [I. M. C.] having sex." Restrepo testified there had been no conversation up to this point since he stopped the tape. Then appellant began to speak, and Restrepo informed him that he would need to advise him of his rights. The transcript reveals that appellant stated, "I already heard them once." Restrepo read appellant the *Miranda* warnings again. Appellant acknowledged that he understood them and wanted to

---

[17] (Citation omitted.) *Holmes v. State*, 284 Ga. 330, 332 (5) (667 SE2d 71) (2008). See *Edwards v. Arizona*, 451 U. S. 477, 484-485 (II) (101 SC 1880, 68 LE2d 378) (1981).

speak without an attorney. Although appellant testified at the new trial hearing, he did not testify concerning this issue.

Appellant's trial counsel, Raymon Burns, testified that he took over the case from attorney Bruce Harvey. According to Burns, appellant's file reflected that Harvey had already stipulated to the admissibility of the statement. Burns testified that he recalled discussing the statement with appellant and that appellant did not have a problem with his statement being revealed to the jury. Accordingly, Burns did not move to exclude the statement. Burns also testified that even if the statement had been excluded, he still would have advised appellant to testify because the victim's testimony was "very, very damaging" and he did not believe that appellant "could let that victim's testimony hang out there unchallenged." The trial court found that counsel's decision not to challenge the statement was sound trial strategy because, even assuming arguendo that the statement was subject to suppression under *Miranda* because the police did not cease questioning appellant once he requested an attorney, the statement would have been admissible to impeach appellant "had he changed his trial testimony in any way." The trial court apparently relied on the rule that a statement obtained in violation of *Miranda* may not be used in the prosecution's case-in-chief, although it may be used to impeach the defendant's credibility if the trial court finds that the statement is voluntary.[18]

Appellant argues that the court's reasoning is flawed in light of *Frazier v. State*.[19] In *Frazier*, the defendant repeatedly asked to speak to his lawyer during his interrogation, but the police continued to question him.[20] We held that trial counsel's failure to object to the admission of the defendant's custodial statement during the state's case-in-chief was deficient performance because, as the state conceded, the statement was obtained in violation of *Miranda*.[21] Finally, we concluded that the defendant was prejudiced by the deficient performance and had established ineffective assistance of counsel.[22]

Based on *Frazier*, we conclude that the trial court in the case at bar clearly erred in determining that counsel's stipulation to the admissibility of appellant's custodial statement was sound trial strategy even if a *Miranda* violation had occurred, because such violation would have rendered it inadmissible in the state's case-in-chief. "Nevertheless, we will affirm the trial court's denial of

---

[18] *Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996).

[19] 298 Ga. App. 487 (680 SE2d 553) (2009).

[20] Id. at 489 (1).

[21] Id. at 489-490 (1).

[22] Id. at 490-491 (1).

[appellant's] motion for new trial under the 'right for any reason' rule if . . . the ultimate judgment was correct."[23]

In this case, unlike in *Frazier*, the record shows that questioning ceased after appellant invoked his right to counsel, albeit after the second request. Appellant made no incriminating statement between the two requests.[24] Thereafter, appellant voluntarily reinitiated discussions with the police when he asked "what this was all about."[25] Appellant was advised of his *Miranda* rights and waived them. Contrary to appellant's argument, Restrepo did not erroneously inform appellant that he was required to sign a *Miranda* waiver before making a statement.[26] Accordingly, appellant has failed to make a strong showing that his statement would have been suppressed had counsel made the motion.[27] Appellant has thus failed to carry his burden of showing that counsel was ineffective for stipulating to the admissibility of the statement.

(b) *Purportedly exculpatory evidence.* Appellant contends that trial counsel failed to present evidence that was available at trial and was exculpatory. This evidence consisted of photographs depicting appellant in an apartment, a few photographs of the victim, a "love note" that appellant claimed the victim wrote him, a copy of an airline reservation, and a copy of a lawsuit brought by the victim's mother against appellant, accusing him of kidnapping her. Appellant testified at the new trial hearing that this evidence showed them as a "couple"; that he asked Burns to introduce it for that reason; and that Burns refused to do so. Appellant asserts on appeal that Burns should have introduced the evidence at trial to impeach the victim's testimony that appellant held her against her will. Burns testified, however, that he had never seen any of the evidence at issue before the new trial hearing. In its order denying appellant's motion for new trial, the trial court found Burns's testimony that he was not presented with the evidence to be more credible than appellant's testimony. As the finder of fact at the new trial hearing, the trial court was entitled to believe trial counsel and disbelieve appellant on this issue.[28] Accordingly, the trial court did not err in rejecting appellant's ineffectiveness claim on this ground.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

---

[23] (Citation omitted.) *Pierce v. State*, 286 Ga. 194, 199 (4) (686 SE2d 656) (2009).

[24] Compare *Robinson v. State*, 286 Ga. 42 (684 SE2d 863) (2009) (police persisted in questioning defendant after he invoked his right to counsel).

[25] See *Holmes*, supra; *Rios v. State*, 281 Ga. 181, 182-183 (3) (637 SE2d 20) (2006).

[26] Compare *State v. Darby*, 284 Ga. 271, 272 (1) (663 SE2d 160) (2008) (affirming grant of motion to suppress custodial statement where officers informed defendant that signing the *Miranda* waiver was a precondition to making a statement).

[27] *Gassett*, supra.

[28] *Ransom v. State*, 297 Ga. App. 902, 906 (2) (a) (678 SE2d 574) (2009).

DECIDED JANUARY 19, 2011 —

*G. Richard Stepp*, for appellant.
*Daniel J. Porter, District Attorney, Karen M. Harris, Assistant District Attorney*, for appellee.